ACCEPTED
01-13-00227-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/13/2015 12:54:54 PM
CHRISTOPHER PRINE
CLERK

NO. 01-13-00227-CR

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/13/2015 12:54:54 PM
CHRISTOPHER A. PRINE
Clerk

JEREMY DION WASHINGTON
*Appellant*

v.

THE STATE OF TEXAS
*Appellee*

On Appeal from Cause Number 1862655
In the 8th County Criminal Court at Law of Harris County, Texas

**BRIEF FOR APPELLANT**

ORAL ARGUMENT REQUESTED

**ALEXANDER BUNIN**
Public Defender
Harris County, Texas

**MARK KRATOVIL**
Assistant Public Defender
Texas Bar Number 24076098
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Telephone: (713) 274-6728
Facsimile: (713) 437-4339
mark.kratovil@pdo.hctx.net

**Counsel for Appellant**

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT                                                  Jeremy Dion Washington
SPN 02368559
6030 Kennelwood
Houston, Texas

DEFENSE COUNSEL AT TRIAL                Brock White
801 Congress St., Suite 215
Houston, Texas 77002

PROSECUTOR AT TRIAL                    Allison Buess
Assistant District Attorney

Anateya Adeygia
Assistant District Attorney
Harris County, Texas
1201 Franklin Street
Houston, Texas 77002

PRESIDING JUDGE                            The Honorable Jay Karahan
8th County Criminal Court
1201 Franklin Street, 9th Floor
Houston, Texas 77002

APPELLANT'S COUNSEL                   Mark Kratovil
Assistant Public Defender
Harris County, Texas
1201 Franklin Street, 13th Floor
Houston, Texas 77002

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.................................................................. ii

TABLE OF CONTENTS ..................................................................................... iii

INDEX OF AUTHORITIES ................................................................................... v

STATEMENT OF THE CASE ................................................................................ 1

ISSUES PRESENTED ........................................................................................... 4

STATEMENT OF FACTS....................................................................................... 4

SUMMARY OF THE ARGUMENT.......................................................................... 9

ARGUMENT..................................................................................................... 11

    **ISSUE ONE:** Officer Sullivan's inability to properly articulate the methodology that he relies on to identify members of street gangs rendered his expert testimony unreliable under Texas Rules of Evidence 702, and the trial court erred in permitting him to testify as an expert witness. .................................... 11

    A. Defense Counsel Preserved Error By Objecting To Officer Sullivan's Testimony, Requesting a *Daubert* Hearing, And Renewing the Objection At the Close Of the Hearing ................................................................................ 11

    B. Under Texas Rules Of Evidence 702, An Expert Must Be Qualified To Testify On the Relevant Subject Matter......................................................... 12

    C. Officer Sullivan Could Not Articulate the Methodology He Used To Identify Gang Members, And Explained That He Relied Almost Entirely On a Computer Program......................................................................................... 13

    D. The Appellant Suffered Harm As Sullivan's Unreliable Conclusions Invaded the Jury's Province As the Trier Of Fact ................................................ 15

    **ISSUE TWO:** The trial court erred in admitting State's Exhibits 24, 25, and 26—photos printed from the internet of various gang symbols—as these exhibits were not properly authenticated..............................................................x

A. Defense Counsel Preserved Error By Objecting When the State Sought To Enter the Exhibits Into Evidence ............................................................................. 16

B. Photographs Must Be Shown To Properly Represent the Object In Question By Any Witness Who Knows the Underlying Facts Portrayed In the Photos . 18

C. There Is Insufficient Evidence In the Record That State's Exhibits 24, 25, and 26 Are a Correct Representation Of the Facts Portrayed.................................... 18

D. The Appellant Suffered Harm As the Introduction Of the Unauthenticated Images Allowed the Jury To Draw Unsubstantiated Connections Between the Exhibits And the Appellant's Alleged Gang Membership......................................... 20

PRAYER.................................................................................................................... 21

CERTIFICATE OF SERVICE ................................................................................ 22

CERTIFICATE OF COMPLIANCE ...................................................................... 23

# INDEX OF AUTHORITIES

## Cases

*Campbell v. State*, 382 S.W.3d 545 (Tex. App.—Austin 2012, no pet.) .......................... 18

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590 (1993) .............................................. 12, 13

*Everitt v. State*, 407 S.W.3d 259 (Tex. Crim. App. 2013) .................................................. 17

*Ford v. State*, 305 S.W.3d 530 (Tex. Crim. App. 2009) ...................................................... 17

*Harris v. State*, 133 S.W.3d 760 (Tex. App.—Texarkana 2004, pet. ref'd) ..................... 15

*Hernandez v. State*, No. 03-04-00356-CR, 2006 WL 191918, at *6 (Tex. App.—Austin

 Jan. 26, 2006, pet. ref'd) (not designated for publication) ........................................... 19

*Huffman v. State*, 746 S.W.2d 212 (Tex. Crim. App. 1988) ............................................... 18

*King v. State*, 29 S.W.3d 556 (Tex. Crim. App. 2000) ....................................................... 11

*Lankston v. State*, 827 S.W.3d 907 (Tex. Crim. App. 1992) .............................................. 17

*Nenno v. State,* 970 S.W.2d 549 (Tex. Crim. App. 1998) ................................................... 14

*Penry v. State*, 903 S.W.3d 715 (Tex. Crim. App. 1995) ................................................... 13

*Roise v. State*, 7 S.W.3d 225 (Tex. App.—Austin 1999, pet. ref'd) ................................. 14

*Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012) ................................................. 18

*Vela v. State*, 209 S.W.3d 128 (Tex. Crim. App. 2006) ...................................................... 11

## Statutes & Rules

Tex. R. App. Proc. Rule 33.1 ..................................................................................... 12, 17

Tex. R. App. Proc. Rule 44.2 ..................................................................................... 15, 20

Tex. R. Evid. Rule 702 ................................................................................ 12, 13

Tex. R. Evid. Rule 705 ..................................................................................... 14

Tex. R. Evid. Rule 901 ................................................................................ 18, 19

Tex. Penal Code § 46.02 ..........................................................................11, 15, 20

Tex. Penal Code § 71.01 ................................................................................... 20

## STATEMENT OF THE CASE

The Harris County District Attorney's Office charged Jeremy Washington ("Appellant") by information on November 16, 2012, with one count of unlawful carrying of a weapon. (C.R. at 3).[1] Specifically, the Appellant was alleged to have been in possession of a handgun in a motor vehicle while the Appellant was a member of a criminal street gang. *Id.*

Voir dire began on February 18, 2013, and a six-person jury was empanelled on that same day. (2 R.R. at 91-92). Following a two-day trial on guilt-innocence, the jury returned a guilty verdict. (4 R.R. at 84-86; C.R. at 57-59). The punishment phase began immediately after the verdict was rendered, and the trial court assessed the Appellant's punishment at one year confinement in the Harris County Jail, with the sentence suspended and the Appellant placed on community supervision for a period of two years. (4 R.R. at 89-94; C.R. at 58-63). A timely Notice of Appeal was filed by the

---

[1] As will be explained in as much detail as possible, the record in this case is unusually dense and complicated for a misdemeanor trial. The record in the present case contains five volumes of the Reporter's Record and one volume of the Clerk's Record from the Appellant's actual trial. Two versions of the Reporter's Record from the Appellant's trial were filed with the Court of Appeals. Citations to the Reporter's Record in this brief refer to the version filed with the First Court of Appeals on July 14, 2014. The record also contains two volumes of Reporter's Records from show cause hearings held on March 26, 2014, and April 16, 2014, before the First Court of Appeals. In addition, there was a lengthy series of show cause and abatement hearings held before the 10th Country Criminal Court at Law, which are included in the record. In an effort to be as clear as possible, any citations to the Reporter's Record from the show cause and abatement hearings will explicitly state the date of the hearing to which the citation is referring. Unless otherwise noted, a citation to the Reporter's Record or Clerk's Record without further clarification can safely be assumed to refer to the record from the Appellant's trial.

1

Appellant and certified by the trial court on February 21, 2013. (C.R. at 68, 70-71). A Motion for New Trial was not filed in the Appellant's case.

The present case is one of nine cases where Sondra Humphrey served as the court reporter, which were all abated to determine whether a complete Reporter's Record could be assembled. (Feb. 26, 2015, Abatement Hearing, R.R. at 4). On March 26, 2014, this Court convened for a hearing on the Court's Order to File Reporter's Record or Show Cause Hearing, which ordered Ms. Humphrey to file a Reporter's Record with the Court of Appeals in the present case by March 24, 2014. (March 26, 2014, Show Cause Hearing, R.R. at 6-9). Ms. Humphrey did not appear at this hearing. (March 26, 2014, Show Cause Hearing, R.R. at 2-4). On April 16, 2014, this Court held a second Show Cause hearing, where Ms. Humphrey appeared with her attorney, Lott Brooks. At this hearing, Mr. Brooks represented to this Court that a Reporter's Record would be filed within the next twenty-four hours. (April 16, 2014, Show Cause Hearing, R.R. at 4). Ms. Humphrey testified before this Court and cited her need for an emergency medical procedure on March 31, 2014, as the reason for her non-appearance at the initial hearing. *Id.* at 8. This Court declined to enter an order of contempt against Ms. Humphrey at the close of the hearing. *Id.* at 15.

On April 24, 2014, the first in a series of abatement hearings was held before Judge Sherman Ross in the 10th County Criminal Court at Law per this Court's Abatement Order. (April 24, 2014, Abatement Hearing, R.R. at 4). The majority of this hearing concerned the state of the record in two other misdemeanor cases in

2

which the Appellant was not a party. *Id.* at 4-5. Ms. Humphrey cited numerous personal and medical issues as the reason for the delay in turning in the Reporter's Record in these particular cases and assured the court that the records would be completed within the next two weeks. *Id.* at 8-13.

The next abatement hearing was held before Judge Ross on May 2, 2014. Ms. Humphrey informed the court that the record in the Appellant's case would be filed on that day by 5:00 p.m. (May 2, 2014, Abatement Hearing, R.R. at 4). Although several hearings were held in the interim, the next substantive hearing impacting the Appellant's case was not until June 30, 2014. In that hearing, Mr. Brooks informed the court that the record in the Appellant's case had been completed. (June 30, 2014, Abatement Hearing, R.R. at 6). However, in a follow-up abatement hearing on July 7, 2014, the court was informed by the State that the record in the Appellant's case was "missing the charge conference, closing arguments, verdict and punishment phase." (July 7, 2014, Abatement Hearing, R.R. at 4-5).

It was not until February 17, 2015, that a complete record in the Appellant's case was filed with this Court. On that day, the State and the Appellant filed a Joint Motion to Reinstate Appeal.[2]

---

[2] A copy of this motion is not included in the record for the Appellant's case. However, it may be viewed on the case information page for this case or at the following link: http://www.search.txcourts.gov/SearchMedia.aspx?MediaVersionID=9b280565-3cd7-4a43-a3c8-f6731171c376&coa=coa01&DT=Motion&MediaID=be99fb57-6a10-4ae0-ba8a-235ba4c94b4b

Findings of Fact were entered by Judge Sherman Ross on February 27, 2015. (Supplemental C.R. at 5-11). In these findings, Judge Ross determined that the record in the present case "is currently acceptable for purposes of returning the case to the Court of Appeals active docket." (Supplemental C.R. at 11). While the Reporter's Record does contain a handful of obvious typographical errors during the testimony of witnesses, these problems do not appear to be so prevalent as to render the record unreliable or incomplete.

On March 17, 2015, this Court reinstated the Appellant's case onto its active docket. This appeal followed.

## ISSUES PRESENTED

**ISSUE ONE:** Officer Sullivan's inability to properly articulate the methodology that he relies on to identify members of street gangs rendered his expert testimony unreliable under Texas Rules of Evidence 702, and the trial court erred in permitting him to testify as an expert witness.

**ISSUE TWO:** The trial court erred in admitting State's Exhibits 24, 25, and 26—photos printed from the internet of various gang symbols—as these exhibits were not properly authenticated.

## STATEMENT OF FACTS

Officer Gordon Sullivan with the Houston Police Department was on patrol in the southeastern part of Houston on October 4, 2011, when he drove past the Appellant on Interstate 610. The car the Appellant was driving appeared to have an expired registration tag, which prompted Sullivan to conduct a traffic stop of the Appel-

lant. (2 R.R. at 117-118). Upon further inspection, Sullivan discovered that the Appellant's registration had been expired for only a few days and the Appellant claimed that he was at that moment on his way to renew the car's registration. (3 R.R. at 20). The traffic stop was routine at first, with Sullivan confirming the Appellant's identification and that he did not have any warrants out for his arrest. But according to Sullivan, the Appellant was wearing all blue and had a blue bandana in the center console of his car. (2 R.R. at 119).

Based on the Appellant's clothing, Sullivan shifted the focus of the traffic stop into a different direction and bluntly asked the Appellant whether he was a gang member. The Appellant told Sullivan that he was a former member of the 52 Hoovers-Crips. At the request of Sullivan, the Appellant got out of his car and showed Sullivan several tattoos, which Sullivan believed reflected the Appellant's affiliation with the 52 Hoovers-Crips. (2 R.R. at 119-121). Although Sullivan had been patrolling this particular area of Houston for about three years as a member of a crime reduction unit, this was the first time that Sullivan had encountered the Appellant. (3 R.R. at 16-17). Indeed, an investigation of the Appellant's background by Sullivan did not reveal that the Appellant had ever been arrested, charged, or convicted for a criminal offense. (3 R.R. at 27). Sullivan described the Appellant as "Very cooperative" and "chilled" during the entirety of the traffic stop. (2 R.R. at 120; 3 R.R. at 14). In Sullivan's experience, members of street gangs are not typically cooperative with him in his capacity as a police officer. (3 R.R. at 22). Further, the Appellant showed Sulli-

van his work identification card, showing that the Appellant was employed as a security officer with MED Security University General. (3 R.R. at 22-23). A search of the Appellant's vehicle found some marijuana seeds and stems, but no usable amount of marijuana was located. (3 R.R. at 13).

At this point, Sullivan decided to let the Appellant leave without arresting him or issuing a citation. However, Sullivan did document the traffic stop and entered information about the Appellant and his car into a program called "Gang Tracker." And just as the name would lead one to believe, Gang Tracker is a program used to identify and track gang members in Houston by documenting their interactions with law enforcement. (2 R.R. at 121-122, 154). Photographs of the Appellant, his car, and his tattoos were entered by Sullivan into Gang Tracker, along with the Appellant's name and vital statistics. (2 R.R. at 122-125; 5 R.R. at 5-11 (State's Exhibits 1-7)). Sullivan noted in the entry he created for the Appellant that he was a former gang member as opposed to an active one. (3 R.R. at 24).

After Sullivan's traffic stop of the Appellant in early October of 2011, Officer Craig Ferzenni with the Houston Police Department's Gang Division Crime Reduction Unit pulled the Appellant's car over on April 8, 2012, at around 11 p.m.. (3 R.R. at 41, 45-49, 52). The reason for the traffic stop was that the Appellant had twice changed lanes without using a turn signal. (3 R.R. at 49-50, 54). As was the case with the traffic stop carried out by Officer Sullivan, this occurred in the southeastern area of Houston. (3 R.R. at 46).

6

Once the Appellant had pulled his car over, Ferzenni and his partner—Officer Robert Revus—split up during their approach to the car, with Ferzenni going to the driver's side window and Revus walking to the passenger side. (3 R.R. at 44, 53-55, 97). The Appellant was driving the car, while his brother—Jarvis Washington[3]—was sitting in the passenger seat. (3 R.R. at 60, 98). While Ferzenni was talking to the Appellant and asking for his driver's license and insurance, Revus saw a pistol inside of the car told Ferzenni to get the Appellant out of the vehicle. (3 R.R. at 59-60, 98-99). The Appellant was not wearing a shirt during the traffic stop, which allowed Ferzenni to see the same tattoos that Sullivan had documented several months earlier. (3 R.R. at 60-62, 84, 102). As was the case with Sullivan, Ferzenni and Revus described the Appellant as non-combative and cooperative during the traffic stop. (3 R.R. at 80, 113).

The Appellant was frisked by Ferzenni and separated from Jarvis Washington, who remained seated in the car. (3 R.R. at 100). A search of the Appellant's vehicle by Revus turned up a pistol found near the passenger's seat. (3 R.R. at 63, 65). The Appellant admitted ownership of the pistol and told Ferzenni that it was something he carried in his capacity as a commissioned security guard. (3 R.R. at 65-66, 81). Once the Appellant had been placed in the backseat of the police cruiser, Ferzenni

---

[3] The record variously refers to the Appellant's brother as both Jyrus Washington and Jarvis Washington. Because the record indicates that he refers to himself as Jarvis during his testimony, this brief will do so as well.

found that the Appellant had been documented as a former gang member in the Gang Tracker program. (3 R.R. at 79, 86, 104).

Sergeant Clint Ponder with the Houston Police Department—a ten year veteran of the department's gang division—provided general background information at the Appellant's trial about the 52 Hoovers-Crips. (3 R.R. at 132-134). According to Ponder, the Hoovers-Crips are a street gang involved in criminal activity. (3 R.R. at 136-137). The colors blue and orange are commonly associated with this particular gang. (3 R.R. at 139-140). Ponder took several photographs of the Appellant's tattoos as they appeared during the trial. (3 R.R. at 140-141). In Ponder's opinion, these tattoos were indicative of membership in a Crips affiliated gang. (3 R.R. at 142-148).

Jarvis Washington—the Appellant's twin brother—testified as a witness for the defense and confirmed that he was a passenger in the Appellant's car on the night they were pulled over by Revus and Ferzenni. (3 R.R. at 173, 176-177). After the Appellant had gotten out of his car, Jarvis recalled hearing that the Appellant told Ferzenni that there was a gun in the car and that he had a license to carry it. No attempt was made to conceal the pistol from the officers. (3 R.R. at 177-179). From Jarvis's understanding, the pistol was something that the Appellant used for his work as a security guard. (3 R.R. at 182). Jarvis was not arrested that night. (3 R.R. at 180).

The Appellant elected to testify at the trial and offered up his own version of events. Initially, the Appellant denied that he had switched lanes and that he had not committed the traffic infraction for which he was pulled over. (3 R.R. at 196). When

8

the Appellant handed Ferzenni his driver's license and insurance, he also provided the officer with his license to carry the pistol and informed him that there was a gun in the car. (3 R.R. at 197). For the Appellant, the pistol was a tool that he used every day at his job. (3 R.R. at 198).

In explaining the presence of the tattoos on his body, the Appellant expressed a desire to have them removed. The tattoos were originally placed on him eight years prior to trial when the Appellant was in the ninth grade at age fifteen. The Appellant decided to get the tattoos because he "was young and everybody was doing it." (3 R.R. at 204-205). He denied having any association with gang members of having engaged in any criminal activities in the five years prior to the trial, but did conceded that he was formerly a member of the 52 Hoovers-Crips. (3 R.R. at 205-206; 4 R.R. at 7).

## SUMMARY OF THE ARGUMENT

The State's first witness at the guilt-innocence phase of trial was Officer Gordon Sullivan, who was certified as an expert witness on the issue of gang membership. But during the *Daubert* hearing to test Sullivan's qualifications as an expert witness, Sullivan was unable to articulate the full methodology he relies upon to identify gang members, and explained that he relies on the Gang Tracker program to provide this methodology to him. Because the defense was essentially prevented from fully and fairly exploring Sullivan's purported methodology, Sullivan was not properly qualified to testify as an expert witness.

During the testimony of Sergeant Clint Ponder, State's Exhibits 24, 25, and 26 were introduced into evidence over the objection of defense counsel. These three exhibits purport to be imagery commonly associated with the 52 Hoovers-Crips gang. Ponder demonstrated no personal knowledge of where this images came from, and the State offered no explanation as to the origin of them. As such, these three exhibits were not properly authenticated and the trial court committed error in admitting them into evidence.

**ISSUE ONE:** Officer Sullivan's inability to properly articulate the methodology that he relies on to identify members of street gangs rendered his expert testimony unreliable under Texas Rules of Evidence 702, and the trial court erred in permitting him to testify as an expert witness.

The State sought to elicit expert testimony from Officer Gordon Sullivan on the subject of criminal street gangs. Although courts have previously upheld the use of expert testimony to explain the membership, terminology, and symbols of gangs, *King v. State*, 29 S.W.3d 556, 560 (Tex. Crim. App. 2000), Sullivan did not demonstrate that his testimony was sufficiently reliable to properly offer expert testimony on the issue of gang membership. And to be clear, the Appellant concedes that since gang affiliation is an element of the offense of unlawful carrying of a weapon, this type of testimony would be relevant. *See* Tex. Penal Code § 46.02(a-1)(2)(c). But it is the reliability of Sullivan's that the Appellant is now challenging. *See Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (trial court must find that three conditions are met for an expert to testify: 1) qualification; 2) reliability; and 3) relevance).

**A. Defense Counsel Preserved Error By Objecting To Officer Sullivan's Testimony, Requesting a *Daubert* Hearing, And Renewing the Objection At the Close Of the Hearing**

Early on in the direct examination by the State of Sullivan, defense counsel objected to the State's line of questioning and stated to the trial court that "this witness

has not been qualified as an expert." (2 R.R. at 107-108). A *Daubert*[4] hearing followed, during which Sullivan's qualifications as a gang expert were explored through cross-examination. (2 R.R. at 108-114). At the close of the hearing, defense counsel renewed his objection, stating that "I'd ask that this witness not be able to testify as any type of expert. I don't believe he even qualifies as an expert under *Daubert*." (2 R.R. at 114-115). Defense counsel's objection was subsequently overruled and Sullivan was permitted to testify as an expert on the issue of gang membership. However, the trial court did permit defense counsel to have a running objection to Sullivan's testimony. (2 R.R. at 115).

Because defense counsel made a timely objection to the trial court, stated the grounds on which his objection was based, the trial court indicated awareness of the nature of defense counsel's objection, and expressly ruled on defense counsel's objection, any potential error has been preserved for appellate review. *See* Tex. R. App. Proc. 33.1(a).

### B. Under Texas Rules Of Evidence 702, An Expert Must Be Qualified To Testify On the Relevant Subject Matter

Testimony by expert witnesses is governed by Texas Rules of Evidence 702. This rule permits a witness qualified by knowledge, skill, experience, training or education to testify on not only scientific subjects, but also on other specialized subjects that would assist the trier of fact in understanding or determining a fact issue. Tex. R.

---

[4] *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590 (1993).

Evid. 702. The opinion offered by the expert must be more than "subjective belief or unsupported speculation," but it does not need to reach the level of "known to a certainty" to be admissible. *Daubert*, 509 U.S. at 590.

There are two hurdles that Rule 702 requires an expert's testimony to overcome: the proponent of the testimony must establish that the expert's specialized knowledge will aid the trier of fact, and that the expert is qualified to testify on the subject. Tex. R. Evid. 702. The burden in this case thus fell on the State to demonstrate that Sullivan was qualified as an expert on the subject of gang membership. *See Penry v. State*, 903 S.W.3d 715, 762 (Tex. Crim. App. 1995).

## C. Officer Sullivan Could Not Articulate the Methodology He Used To Identify Gang Members, And Explained That He Relied Almost Entirely On a Computer Program

In the course of the *Daubert* hearing, Sullivan explained that his qualifications as an expert in gang membership consisted of the following: 1) five years of experience with the Houston Police Department; 2) an eight hour training class that he was required to take every other year; 3) an unspecified amount of training he received in the police academy; and 4) interactions with three members of the 52 Hoovers-Crips over the past five years. (2 R.R. at 108-111). Sullivan also touched on the criteria that he relies on to identify gang members, explaining that there are eight factors that he looks for to identify someone as a member of a gang and that only two of these factors must be present to qualify someone as a gang member (2 R.R. at 112). Among these factors were "colors, tattoos, self-admission, being around other documented

13

gang members, having a confidential and reliable witness." *Id.* But Sullivan was unable to articulate the remaining factors, stating that "I got to have the tracker in front of me to see the rest of them." *Id.*

Because Sullivan was contending that there was a particular methodology that he relied on to identify gang members, it was incumbent that the methodology be validated as a legitimate one. *See Nenno v. State,* 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds, State v. Terrazas,* 4 S.W.3d 720 (Tex. Crim. App. 1999). Put simply, because Sullivan could not explain all of the factors he relies on to identify a gang member, it was impossible to properly vet the methodology that underlies the gang member identification process that he used to classify the Appellant as a gang member. Since the "expertise must be measured against the particular opinion the expert is offering," *Roise v. State*, 7 S.W.3d 225, 234 (Tex. App.—Austin 1999, pet. ref'd), the expert testimony of Sullivan must have been based on a reliable foundation. See also Tex. R. Evid. 705(c) ("An expert's opinion is inadmissible if the underlying facts or data do not provide a sufficient basis for the opinion.").

Because Sullivan was unable to properly articulate the underlying data or facts that formed the basis of his testimony as an expert witness, the defense was in effect prevented from conducting a full voir dire of the basis of his testimony. Under Texas Rules of Evidence 705(b), the Appellant had a mandatory right to examine Sullivan about the underlying facts or data that inform his opinion. Sullivan's inability to provide this underlying methodology denied the Appellant the opportunity to explore the

14

basis of Sullivan's opinion and rendered his expert testimony unreliable. *See Harris v. State*, 133 S.W.3d 760, 775 (Tex. App.—Texarkana 2004, pet. ref'd) (holding that the trial court abused its discretion by not allowing the defense to voir dire an expert witness regarding the underlying data or facts that formed the basis of the expert's testimony). Thus, the trial court erred in allowing Sullivan to testify as an expert witness on the subject of gang membership when Sullivan could not provide the underlying facts, data, and methodology that crafted his opinion, rendering it unreliable.

## D. The Appellant Suffered Harm As Sullivan's Unreliable Conclusions Invaded the Jury's Province As the Trier Of Fact

Because any error in allowing Sullivan to testify as an expert witness is non-constitutional in nature, harm to the Appellant is assessed under Texas Rules of Appellate Procedure 44.2(b).

Membership in a gang is a critical element of the crime the Appellant was charged with. Tex. Penal Code § 46.02(a-1)(2)(c). Sullivan was the first member of law enforcement to take official action to label the Appellant as a member of a gang during the traffic stop which took place on October 4, 2011, approximately six months before the incident for which the Appellant was arrested. (2 R.R. at 117; 3 R.R. at 43). And it was Sullivan who originally made the decision to enter the Appellant into the Houston Police Department's Gang Tracker program, which the arresting officers would later rely on. (3 R.R. at 23, 79).

15

By allowing Sullivan to testify as an expert in gang membership, the trial court permitted Sullivan to opine on the significance of things such as the Appellant's tattoos and the color of the Appellant's car, which were the primary pieces of evidence the State relied on to prove up the element of gang membership in the criminal charge against the Appellant. (2 R.R. at 121; 3 R.R. at 9, 11). This testimony, based on Sullivan's unreliable foundation of underlying data and facts for his expert opinion, crossed the line between assisting the jury and replacing the jury as the trier of fact and caused the Appellant harm.

> **ISSUE TWO:** The trial court erred in admitting State's Exhibits 24, 25, and 26—photos printed from the internet of various gang symbols—as these exhibits were not properly authenticated.

During the testimony of Sergeant Clint Ponder—an officer who was not directly involved in the Appellant's case and offered only expert testimony on gangs—the State sought to introduce State's Exhibits 24, 25, and 26. (3 R.R. at 148-150; 5 R.R. at 27-29). These images purported to show a variety of gang symbols associated with the 52 Hoovers-Crips, primarily revolving around the Houston Astros logo. *Id.*

## A. Defense Counsel Preserved Error By Objecting When the State Sought To Enter the Exhibits Into Evidence

After the State had presented State's Exhibits 24, 25, and 26 to Ponder, the prosecutor moved to have the trial court enter the exhibits into evidence. At this point, defense counsel objected, stating that "I have no idea where these exhibits were derived from, nor do I have any idea of how they're relevant to the current case," and

that "This looks like somebody just printed it out off a website." (3 R.R. at 149-150). After the trial court requested to inspect the exhibits, the trial court overruled defense counsel's objections and entered the three photographs into evidence, which the State subsequently published to the jury. *Id.*

Although defense counsel did not specifically use the term "authentication," the nature of his objection was apparent from context. *See* Tex. R. App. Proc. 33.1(a)(1)(A) (error is preserved if an objection "stated the grounds for the ruling . . . unless the specific grounds were apparent from the context"). Neither the trial court nor the State expressed any confusion about the basis for defense counsel's objection, and the trial court gave a ruling adverse to the defense counsel's objection. Therefore, error was preserved for appellate review. *See, e.g., Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013) (reiterating that there are no hyper-technical requirements for error preservation); *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009) (an objection preserves error if it is "sufficiently clear to provide the trial judge and opposing counsel an opportunity to address and, if necessary, correct the purported error"); *Lankston v. State*, 827 S.W.3d 907, 909 (Tex. Crim. App. 1992) ("Straightforward communication in plain English will always suffice [to preserve error].").

**B. Photographs Must Be Shown To Properly Represent the Object In Question By Any Witness Who Knows the Underlying Facts Portrayed In the Photos**

Any error in the trial court's decision to admit evidence over an authentication objection is reviewed under an abuse of discretion standard. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012).

Issues of authentication occur when the relevancy of evidence is conditioned on its identity. *Campbell v. State*, 382 S.W.3d 545, 549-50 (Tex. App.—Austin 2012, no pet.). As a general rule, authentication can be achieved by direct testimony from a witness with personal knowledge, or by circumstantial evidence. Tex. R. Evid. 901. In regards to still photographs, the predicate for introduction requires proof of its accuracy as a correct representation of the subject at a given time, and its relevance to a material issue. *Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988). Although it is ideal for the person who took the photograph to authenticate them from the witness stand, this is not an absolute necessity and a person other than the photographer can authenticate the pictures. *Id.*

**C. There Is Insufficient Evidence In the Record That State's Exhibits 24, 25, and 26 Are a Correct Representation Of the Facts Portrayed**

There is nothing in the record to indicate what the source of State's Exhibits 24, 25, and 26 is. In arguing to the trial court that the photographs should be admitted, the State seemed to tacitly admit that these exhibits had been pulled from an uni-

dentified online source, but that this was permissible since Ponder "testified that he does sometimes use the Internet." (3 R.R. at 149).

The circumstances under which a photograph was obtained is a significant factor in determining whether it has been properly authenticated through a witness who did not take the photograph. *See Hernandez v. State*, No. 03-04-00356-CR, 2006 WL 191918, at *6 (Tex. App.—Austin Jan. 26, 2006, pet. ref'd) (not designated for publication) (holding that the seizure of a photograph by a police officer who did not take the photograph demonstrated sufficient circumstances to properly authenticate it). The State offered no explanation as to the origins of State's Exhibits 24, 25, and 26. Ponder demonstrated no personal knowledge of when and where the photographs had been made, and could therefore not offer credible testimony as to whether the exhibits were fair and accurate depictions of what they purported to be. *See* Tex. R. Evid. 901(a).

In particular, State's Exhibit 26 depicts what appears to be a large quantity of marijuana packaged for individual sale, a wad of twenty dollar bills, and two Houston Astros baseball caps arranged in a way that might be most appropriate for the cataloging of seized evidence by law enforcement. (3 R.R. at 151; 5 R.R. at 29). According to Ponder, this image demonstrates "just kind of an attractiveness to the gang, 'Hey, you can make money and sell drugs,' and you know, the coolness stature, I guess." (3 R.R. at 151). But because Ponder demonstrated no knowledge of the origins of this image, there is no way to know whether this was an exhibit created by the State, members of

19

law enforcement, or by a gang member. Further, there was no allegation made at trial that the Appellant was involved in drug sales or that he was carrying an inordinately large amount of marijuana or cash, as depicted in State's Exhibit 26.

**D. The Appellant Suffered Harm As the Introduction Of the Unauthenticated Images Allowed the Jury To Draw Unsubstantiated Connections Between the Exhibits And the Appellant's Alleged Gang Membership**

As was the case in the previous point of error, harmless error analysis under Texas Rules of Appellate Procedure 44.2(b) applies. State's Exhibits 24, 25, and 26 purported to be objective evidence of symbols employed by the 52 Hoovers-Crips gang, and the State used these exhibits through Ponder to link the imagery to the Appellant's tattoos and the criminal activity of the gang, to which the Appellant was unfairly associated. There was no other evidence offered of the Appellant's involvement in criminal activity outside of the allegation that the Appellant must be dealing drugs since that's what this gang does, according to Ponder and as represented by State's Exhibit 26. (3 R.R. at 151; 5 R.R. at 29).

Because the State was required to prove both that the Appellant was a member of a criminal street gang and that the gang he was a member of regularly engages in criminal activities, these exhibits were central to a critical element of the State's case. *See* Tex. Penal Code §§ 46.02(a-1)(2)(c), 71.01(d). The introduction of these unauthenticated images thus harmed the Appellant, as they provided evidence of the alleged criminal activities of the 52 Hoovers-Crips.

**PRAYER**

Jeremy Washington asks this Honorable Court to reverse the judgment of guilt for the offense of unlawful carrying of a weapon and remand the case to the trial court for a new proceeding on guilt-innocence.

Respectfully submitted,

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas

/s Mark Kratovil
**MARK KRATOVIL**
Assistant Public Defender
Texas Bar Number 24076098
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Telephone: (713) 274-6728
Facsimile: (713) 437-4339
mark.kratovil@pdo.hctx.net

**CERTIFICATE OF SERVICE**

I certify that I provided a copy of the foregoing brief to the Harris County District Attorney's appellate division by electronic delivery through eFile Texas on June 13, 2015.

/s Mark Kratovil
**MARK KRATOVIL**

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3), undersigned counsel certifies that this brief complies with the type-volume limitations of Tex. R. App. Proc. 9.4(e)(i).

1. Exclusive of the portions exempted by Tex. R. App. Proc. 9.4 (i)(1), this brief contains **2,614** words printed in a proportionally spaced typeface.

2. This brief is printed in a proportionally spaced typeface using Garamond 14 point font in text and Garamond 12 point font in footnotes.

3. Upon request, undersigned counsel will provide an electronic version of this brief and/or a copy of the word printout to the Court.

4. Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Tex. R. App. Proc. 9.4(j), may result in the Court's striking this brief and imposing sanctions against the person who signed it.

/s Mark Kratovil
**MARK KRATOVIL**